UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (603) 923-1260 | Case No. 1:19-mj- 174-01-AJ<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer Matthew Harnish, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for search warrants, under Federal Rule of Criminal Procedure 41, to determine the location of the cellular device assigned call number (603) 923-1260 (the "1260 Phone" or the "Target Cellular Device").

2. I am a Dover Police Detective assigned to the New Hampshire Safe Streets Gang Task Force ("NHSSGTF") with the Federal Bureau of Investigation ("FBI") serving in the capacity of a Task Force Officer ("TFO"). I have been assigned to the FBI since April of 2019. From 2013 until 2019, I was assigned to the Uniformed Patrol Division at the Dover, New Hampshire Police Department. From 2016 until the present, I have been assigned to the Strafford County Regional Tactical Operations Unit. In April of 2019 I was assigned to the Dover Police Department's Special Investigations Unit, more specifically assigned to the New Hampshire Safe Streets Gang Task Force, Federal Bureau of Investigation Boston Division.

3. Over the course of my employment as a Dover Police Officer/Detective and FBI Task Force Officer, I have conducted and participated in hundreds of criminal investigations

which have resulted in arrests for crimes involving controlled substance violations, firearms violations, home invasion, larceny, assault and battery with a dangerous weapon, breaking and entering, and armed robbery.

4. I have written and/or participated in the execution of numerous search warrants resulting in the seizure of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as collection, expenditure, accounting, transportation and laundering of drug proceeds. I have participated in debriefing numerous defendants, informants, and witnesses who had personal knowledge regarding narcotics trafficking organizations. I have participated in all aspects of drug investigations including surveillance, executing searches pursuant to court-ordered search warrants, and executing arrests. I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.

5. During my career in law enforcement, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug trafficking conspiracies. In the course of conducting criminal investigations, I have employed the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, conducting short-term and long-term narcotics investigations, consensual monitoring and recording of both telephonic and non-telephonic communications, conducting controlled drug purchases, and preparing and executing search warrants that resulted in seizures of narcotics, firearms, and other contraband.

6.      I make this affidavit in support of an application for a search warrant, under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), for information about the location of the Target Cellular Device with no subscriber information, whose service provider is Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey, used by Dawson Boston. The Target Cellular Device is further described in Attachment A and the location information to be seized from Verizon Wireless is further described in Attachment B.

7.      I further submit this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ a cell-site simulator, an electronic investigative technique described in Attachment C, to assist in locating the Target Cellular Device.  Based on conversations with other investigators who have requested the information described in Attachment B, I know that cellular service providers do not always provide real-time location information.  Rather, investigators may be required to periodically request the historical location information from cellular service providers. Therefore, a cell-site simulator, used in conjunction with information provided by Verizon Wireless, will be necessary to assist investigators in identifying the real-time location of the Target Cellular Device. Further, the requested information described in Attachment B does not always yield precise location information. Therefore, the electronic investigative technique described in Attachment C is requested to be used in conjunction with the location information requested in Attachment B to provide better accuracy to the precise location of the Target Cellular Device.

8.      One purpose of applying for this warrant is to determine with precision the location of the Target Cellular Device. As discussed below, there is reason to believe that the Target Cellular Device is currently located somewhere within this district. I believe that it is used

by Dawson Boston who I know lives in and primarily sells drugs in this district. Pursuant to Rule 41(b)(2), law enforcement may use the technique described in Attachment C outside the district provided the device is within the district when the warrant is issued.

9. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 have been committed, are being committed, and will be committed by Dawson Boston ("Boston"), Glenn Brill ("Brill") and others. There is also probable cause to believe that the location of the Target Cellular Device will constitute evidence of those criminal violations, including leading to the identification of individuals who are engaged in the commission of these offenses and identifying locations where the targets engage in criminal activity.

10. Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

11. The information in this affidavit is based in part on information supplied by a confidential source ("CS #1"). CS #1 has convictions for burglary, assault, failure to appear, theft, and unsworn falsification. He/she has a history of involvement with a violent street gang. CS #1 previously cooperated with the FBI, but was terminated as a cooperator because of a domestic violence incident. According to CS #1, part of the reason he/she stopped cooperating at that time was because of his/her drug use and because of issues relating to a significant other, apparently referring to the domestic violence incident. When CS #1 was released from a recent

4

prison sentence, he/she contacted the FBI about cooperating in exchange for money. Once during his/her recent cooperation, he/she was stopped for driving without a license but he/she has since resolved that ticket. The FBI provided CS #1 with some money to help get his/her license reinstated. Since cooperating with the FBI recently, CS #1 has been compensated with approximately $7,000. Over the summer of 2019, CS #1 got in an altercation with a family member who accused him/her of stealing a credit card. Although the family member has since dropped the charges, we have not used CS #1 to cooperate since that time. CS #1's information about this case has consistently been reliable and I have corroborated it with surveillance observations and other sources.

12.     CS #2 was a target of an FBI investigation for selling heroin/fentanyl in the Seacoast area. Investigators suspected that he/she was selling between 200 and 300 grams of fentanyl every few days. Some of his/her associates were arrested in the Spring of 2019 and CS #2 approached the FBI, apparently afraid that he/she was being targeted as well and asked to cooperate. CS #2 is cooperating with law enforcement officers in hopes of not facing charges for his/her drug trafficking and has been compensated with approximately $9,000. His/her cooperation has resulted in the arrests of at least three people and has led to substantial seizures of narcotics. He/she continues to assist in other investigations. He/she has convictions for simple assault, willful concealment, false report, burglary, second degree assault, theft by unauthorized taking, resisting arrest, violation of probation, false information to law enforcement, felonious sexual assault, simple assault, 2nd degree assault, resisting arrest, reckless conduct, and conduct after an accident. I have corroborated CS #2's information and found it to be reliable.

13.     As part of this investigation, officers conducted various controlled purchases of drugs using CS #1 and CS #2. Before and after each deal, CS #1 and CS #2 were thoroughly

searched for drugs, money, or other contraband with negative results. They were provided audio/video recording devices whenever possible and kept under close law enforcement surveillance.

14. In February of 2019, Boston was stopped by the New Hampshire State Police as a passenger in a vehicle. He provided telephone (603) 923-1260 as his contact number ("the 1260 Phone"). In March of 2019, officers met with CS #1 who told them that Boston was supplying heroin/fentanyl to the Seacoast area in New Hampshire (specifically Dover, Somersworth and Rochester) and uses runners to deliver his drugs. According to CS #1, Boston told him/her this information because they knew each other socially. At one point, Boston agreed to sell CS #1 heroin/fentanyl. CS #1 provided law enforcement officers with the 1260 Phone as the phone he/she uses to contact Boston.

15. On April 9, 2019, CS #1 contacted Boston by text on the 1260 Phone and asked to buy six "whole" meaning 60 grams of fentanyl. During a conversation with Boston (on a different telephone, known by CS #1 to be used by an associate of Boston's), Boston described his product as "fire" and "raw," discussed his other customers, his supplier, and how he sends back dope if it isn't of good enough quality. Boston said that he would have "his guy" contact CS #1 about a drug sale.

16. A man later identified as Brill then contacted CS #1 using telephone number (603) 923-1934 ("the 1934 Phone") and they planned to meet near Brill's residence, an apartment complex at 3 Regent Drive, Dover, New Hampshire. Brill got in the car, introduced himself as "Ricky" and they discussed the quantity of drugs. The conversation was audio recorded. Brill said he switched his phone number frequently. Brill subsequently sold CS #1 what lab results confirmed to contain 37 grams of a mixture of heroin and fentanyl. After Brill

got out of the car, law enforcement agents took a clear photo of his face. They were able to compare this to photographs of Brill from recent arrests and law enforcement officers familiar with Brill confirmed that it was him. Also, Brill has a registered address at 3 Regent Drive, Apartment 316, Dover, New Hampshire (the "Regent Drive Residence").

17. On April 15 and April 16, 2019, CS #1 arranged another purchase through text message with Boston.[1] Over the messages, he/she discussed prices and quality of drugs. Boston again directed him to "Ricky" (identified as Brill). Over text messages with Brill, the CS wrote "I thought Dawson said 200" as the price per finger. They discussed the price and Brill responded, "Don't say his name over text either" apparently referring to Boston. The deal was planned for April 16, 2019. During the video recorded meeting, CS#1 got in the car and exchanged $1780 for a bag containing approximately 70 grams of heroin/fentanyl. The two drove around the block and the CS asked Brill for a "tool for protection." Brill responded he could get him a "40 for 300" which I believe to refer to a .40 caliber firearm. Brill said that he had bullets as well but wouldn't sell the ammunition because he bought it in his own name. He said he could get the gun to CS #1 at any time. They discussed "Dawson" in the car as well. The recording clearly shows Brill's face. Lab results confirmed that CS #1 purchased approximately 70.1 grams of a mixture of heroin and fentanyl.

18. On April 18, 2019, CS #1 contacted Boston and asked to purchase another 20 grams for $500. He/she then reached out to Brill and confirmed the order of 20 grams and asked about the previously-discussed firearm. Brill confirmed he could get it for him/her. CS #1 picked up Brill near the Regent Drive Residence, and Brill handed CS #1 the drugs and firearm and

---

[1] The CS made some unrecorded calls to Boston the day before the deal trying to set it up.

ammunition in a plastic bag. The CS then returned Brill to the parking lot of the Regent Drive Residence. After the deal, the CS turned over a Smith & Wesson handgun, serial number HEW1928, fourteen .40 caliber rounds, and what lab results confirmed to be approximately 20.2 grams of a mixture and substance containing heroin and fentanyl to officers.

19. On or about May 5, 2019, CS #1 called Boston (on the 1260 Phone) and attempted to set up a purchase of 110 grams of fentanyl. Boston negotiated pricing with him (settling on $275 a finger). Boston told the CS he would meet "Chris" to get the drugs and they planned the deal for May 7, 2019.

20. On May 7, 2019, Boston, using the 1260 Phone, texted CS #1 the telephone number for someone he referred to as "Blizzy" who would meet CS #1 to sell him drugs. The CS called Blizzy from New Hampshire and Blizzy told the CS to meet him at an address in Berwick, Maine. When he arrived, Blizzy got in the front passenger's seat of the car with a black backpack. He opened the backpack and showed the CS a package wrapped in black tape. The CS drove Blizzy to a nearby convenience store, gave him $1,000 and dropped him off. Lab results confirmed that the package contained approximately 109.9 grams of fentanyl.

21. On May 16, 2019, CS #1 attempted to conduct a purchase with Boston, but Boston was unavailable. Over various days, Boston used the 1260 Phone to text and call CS #1 asking to collect additional money CS #1 owed him from the drugs sold by "Blizzy" on May 7, 2019.

22. On May 20, 2019, the CS attempted to return the money to Boston, who refused to meet him directly, saying, "I got people who do this shit for me." The CS attempted to buy drugs from Boston that day as well, but Boston said he was out of drugs to sell. Eventually, the

CS met up with Brill (clearly visible on video) and provided him the money owed to Boston. CS #1 drove Brill around as Brill counted the money.

23.     Agents met with CS #2 over the summer of 2019. Although CS #2 had never purchased drugs from Boston or his associates before, he/she knew of them because they ran in similar social circles. At the direction of the FBI, CS #2 introduced himself to Boston and asked if he/she could start buying drugs from him. Boston provided CS #2 with the 1260 Phone as his personal number. On July 9, 2019, CS #2 contacted Boston over the 1260 Phone and placed an order for 100 grams of heroin/fentanyl for $2,750. Boston directed him to go to the Regent Drive Residence. When CS #2 arrived, Boston met him near the entrance to building 3, and CS #2 followed Boston into apartment 316, which the CS reported was the last door on the left on the first floor of the apartment building. Boston used a scale to weigh the drugs and then provided CS #2 with a baggy containing a white powdery substance. This deal was video recorded and Boston's face is clearly visible on the recording. While CS #2 was in the apartment, Brill walked out of another room. During conversation between the three, Brill and Boston discussed sharing the rent.[2] CS #2 provided the suspected drugs to law enforcement officers after the purchase. Although lab results have not yet been received, I believe, based on my training and experience, that the substance is consistent with the color, texture and packaging of heroin and/or fentanyl.

24.     On July 29, 2019, CS #2 conducted a second controlled buy from Boston. CS #2 contacted Boston on the 1260 Phone and placed an order for 150 grams of heroin/fentanyl. CS #2 was directed to pick up Brill and Boston near an address in Rochester, New Hampshire. Once they were in the car, they directed CS #2 to drive them back to the Regent Drive Residence,

---

[2] Officers previously believed that Boston resided elsewhere with a girlfriend.

where all three went inside apartment 316. Both Brill and Boston were present while Boston weighed the drugs on a scale. CS #2 provided Boston with $4,000 in exchange for a bag containing a white powdery substance. Boston also provided CS #2 with a sample of what he described as a stronger sample of drugs, which he called "fire." This conversation was captured on the video recording device. CS #2 provided the suspected drugs to law enforcement officers after the purchase. Although lab results have not yet been received, I believe, based on my training and experience, that the substance is consistent with the color, texture and packaging of heroin and/or fentanyl.

25. There is probable cause to believe that the Target Cellular Device (the 1260 Phone) has been used in furtherance of a drug trafficking conspiracy and that the requested warrant will allow me to collect evidence of criminal violations and identify coconspirators. I am also seeking a complaint charging Boston with a conspiracy to distribute and possess with intent to distribute controlled substances and the requested warrant will allow me to locate him and execute an arrest warrant should the complaint be issued. The requested warrant will allow me to more precisely pinpoint the location of the Target Cellular Device.

## THE RELEVANT TECHNOLOGY AND MANNER OF EXECUTION

26. I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the

"cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

27. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers, including the call number.

28. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifiers of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the location of the Target Cellular Device, even if it is located inside a house, apartment, or other building.

29.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

## AUTHORIZATION REQUEST

30.     I request that the Court issue the proposed search warrants, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.[3] The proposed warrants will also function as a pen register order 18 U.S.C. § 3123.

31.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing these warrants to delay notice until 30 days from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrants

---

[3] 18 U.S.C. 2703(c) authorizes a "court of competent jurisdiction" to issue a search warrant for the kinds of records that this application seeks. A "court of competent jurisdiction" includes a district court ("including a magistrate judge") that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

32. I also request that the Court direct Verizon Wireless to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the Target Cellular Device described in Attachment A on Verizon Wireless's networks, and at such intervals and times as directed by the government. The government will compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

33. I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order Verizon Wireless not to notify any person (including the subscriber or customer to whom the materials relate) of the existence of these applications, the warrants, or the execution of the warrants, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b). Verizon Wireless may disclose this Order to an attorney for Verizon Wireless for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There

is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by: giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. See 18 U.S.C. § 2705(b).

34. I further request that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

35. I further request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court, except that the government may produce them in criminal discovery and provide the search warrants to Verizon Wireless. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully Submitted,

/s/ Matthew Harnish
Matthew Harnish
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me
on August 13, 2019:

HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

Information about the location of the mobile phone assigned call number (603) 923-1260 ("the Target Cellular Device") with no subscriber information, whose service provider is Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey, used by unidentified individuals.

## ATTACHMENT B

All information about the location of the Target Cellular Device described in Attachment A for a period of thirty days from the date that investigators begin receiving data pursuant to this warrant, during all times of day and night, including:

1. E-911 Phase II data;
2. GPS data;
3. latitude-longitude data;
4. other precise location information; and
5. data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Cellular Device.

This warrant does not authorize the collection of any content of any communications.

Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information about the location of the Target Cellular Device unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the Target Cellular Device on Verizon Wireless's network, and at such intervals and times directed by the government. The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

Verizon Wireless shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b). *See* 18 U.S.C.

§ 2705(b).  Verizon Wireless may disclose this Order to an attorney for Verizon Wireless for the purpose of receiving legal advice.

_____